UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHARTER PRACTICES                   :
NTERNATIONAL, LLC, et al.,          :
                                    :
       Plaintiffs,                  :
                                    :
v.                                  :       CASE NO. 3:12-cv-1768(RNC)
                                    :
JOHN M. ROBB,                       :
                                    :
       Defendant.                   :

RULING ON MOTIONS TO EXCLUDE EXPERT OPINIONS

Plaintiffs, Charter Practices International, LLC ("CPI")

and Medical Management International, Inc. ("MMI"), bring this

breach of contract action against former franchisee, defendant

John M. Robb.  Plaintiffs move to exclude the opinions of three

of defendant's expert witnesses pursuant to Rule 702 of the

Federal Rules of Evidence and the standard set forth in Daubert

v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and

its progeny.[1] (Doc. #206, 208, 212.)

I.   Background

The court incorporates by reference the background set

forth in its March 16, 2015 recommended ruling. (Doc. #250.)

Pending before the court are plaintiffs' motions to exclude the

opinions of three of defendant's expert witnesses:  W. Jean

Dodds, Patricia Jordan, and Gary Crakes.

_____

[1]In April 2013, U.S. District Judge Robert N. Chatigny
referred this case to the undersigned for all pretrial matters,
including a ruling on these motions. (Doc. #113.)

II.  Legal Standard

With regard to expert testimony, Rule 702 of the Federal

Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"[T]he district court has a 'gatekeeping' function under

Rule 702 — it is charged with 'the task of ensuring that an

expert's testimony both rests on a reliable foundation and is

relevant to the task at hand.'"  Amorgianos v. Nat'l R.R.

Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (quoting

Daubert, 509 U.S. at 597).  Generally, courts consider whether

the theory or technique upon which the expert relies: (1) can be

and has been tested; (2) has been subjected to peer review and

publication; (3) has a known or potential rate of error; and (4)

has been widely accepted by the relevant scientific community.

Daubert, 509 U.S. at 593-94.  The test of reliability is

flexible, however, and the specific Daubert factors "neither

necessarily nor exclusively appl[y] to all experts or in every

case."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).

2

The party proffering the expert testimony bears the burden of demonstrating its admissibility by a preponderance of the evidence.  Daubert, 509 U.S. at 592, n.10.  "[T]he rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702 Advisory Committee Note (2000).

III. Discussion

The court considers each of plaintiffs' motions in turn.

A. W. Jean Dodds

Plaintiffs first argue that the court should preclude defendant's expert, W. Jean Dodds, D.V.M. ("Dodds"), from testifying because her opinion is not supported by reliable principles or methods and does not fit the facts of this case. Dodds is a veterinarian in the field of immunology with more than 45 years of experience.  It is her opinion that defendant's practice of giving half-doses[2] of vaccines to pets weighing less than 50 pounds, as well as his practice of storing the remaining half-doses of vaccines for use on another pet, did not breach the standard of care in veterinary medicine.  Defendant offers Dodds's testimony to show that he acted in accordance with the standard of care.

---

[2]The manufacturer's recommended vaccine dosage for all vaccines at issue here is 1 mL. (Doc. #207-1, p. 4, Def. Interrog. Resp.)  Accordingly, a half-dose is 0.5 mL.

### 1. Reliability of Dodds's Opinion

The court's first task is to ensure that Dodds's expert testimony rests on a reliable foundation.  Plaintiffs argue that Dodds's opinion is not supported by reliable principles or methods because it (1) is based "entirely" on an informal, unpublished study that she conducted in the 1970s, the results of which were destroyed; (2) cites contradictory studies; and (3) otherwise lacks supporting authority.  They argue that her opinion is the purely anecdotal kind of ipse dixit that Daubert and Rule 702 seek to prohibit.

Plaintiffs' main argument is that Dodds's opinion is unreliable because it is based "entirely" on her own unpublished, non-peer reviewed study from the 1970s, the results of which no longer exist.  Here, the absence of peer review and lack of publication of this study do not render Dodds's opinion unreliable.  To begin with, Dodds's opinion is not based "entirely" on her 1970s study.[3]  She cites more than 25 published

---

[3]To fund this study, Dodds received a grant from the National Heart, Lung, and Blood Institute.  (Doc. #207-4, p. 6, Dodds Dep.)  The results of the study belonged to the New York State Department of Health, where Dodds worked, and were destroyed when she left her position there. (Doc. # 207-4, p. 9, Dodds Dep.)  She explained at her deposition that she would have asked to retain the results if she had known the Department would destroy them. (Doc. #207-4, p. 12, Dodds Dep.)  She had no specific reason for not publishing the results other than the fact that she was "very busy" at the time. (Doc. #207-4, p. 7, Dodds Dep.)

articles in her opinion letter.[4]   (Doc. #207-3, p. 11, Dodds

Letter.)   Her opinion also is founded on her experience as a

veterinarian in the field of immunology with "nearly five

decades of clinical research experience with vaccinations in

companion animals." (Doc. #207-3, p. 12.)   See Campbell v.

Metropolitan Property & Cas. Ins., 239 F.3d 179, 185 (2d Cir.

2001) (affirming trial court's admission of expert opinion that

was based on published studies as well as vast clinical

experience where expert's "theories were daily being tested in

practice").   Moreover, although the results of her study were

not published or subject to peer review, Daubert makes it clear

that peer review is merely one factor among many that the court

may consider when assessing reliability.   See Daubert, 509 U.S.

at 594 ("The fact of publication (or lack thereof) in a peer

reviewed journal thus will be a relevant, though not

---

[4]Dodds's opinion letter is organized into two sections: the first provides a summary of the field of small animal vaccination and the second relates to the specific issues in this case.   She cites more than 25 scholarly articles at the end of the first section.   Plaintiffs seem to argue that Dodds's placement of these references indicates her reliance upon them for the first section of her opinion letter, but does not frame her opinion on the present case.   Contrary to plaintiffs' argument, Dodds explains in the first sentence of the second section of her opinion letter that "[i]n addition to the other literature cited above, Moore et al. published two landmark studies from the Banfield Corporation's national database on the adverse events that occurred after vaccination of dogs (2005) and cats (2007)."   (Doc. # 207-3, p. 11, Dodds Letter.)   It is clear that Dodds relied upon these sources not only to provide her summary of the field, but also to form her opinion on the issues in the present case.

dispositive, consideration in assessing the scientific validity
of a particular technique or methodology on which an opinion is
premised."). Peer review and publication enhance credibility,
but "the absence of peer review alone does not warrant excluding
the testimony . . . . [T]he mere fact that an expert's findings
have not been peer reviewed or published is not a sufficient
reason to exclude it." Peerless Ins. Co. v. Broan-NuTone LLC,
No. 3:10CV0868(JCH), 2012 WL 1288196, at *2 (D. Conn. Apr. 16,
2012) (citation and internal quotation marks omitted); Astra
Aktiebolag v. Andrx Pharm., Inc., 222 F.Supp. 423, 489 (S.D.N.Y.
2002).

Plaintiffs next argue that Dodds's opinion is unreliable
because she cites two studies[5] that contradict her opinion. "In
assessing the reliability of a proffered expert's testimony, a
district court's inquiry under Daubert must focus, not on the
substance of the expert's conclusions, but on whether those
conclusions were generated by a reliable methodology."
Amorgianos, 137 F. Supp. 2d at 162. The court need not weigh
the correctness of an expert's opinion or analyze and study the
science in question in order to reach its own conclusions. See

---

[5]George E. Moore, et al., Adverse Events After Vaccine
Administration in Cats: 2,560 Cases (2002-2005), 231 J. Am.
Veterinary Med. Ass'n 94 (Jul. 1, 2007) (Doc. #207-5); and
George E. Moore, et al., Adverse Events Diagnosed within Three
Days of Vaccine Administration in Dogs, 227 J. Am. Veterinary
Med. Ass'n 1102 (Oct. 1, 2005).

Travelers Prop. & Cas. Corp. v. Gen. Elec. Co., 150 F. Supp. 2d
360, 364 (D. Conn. 2001).  Ultimately, it is the role of the
trial court "to make certain that an expert, whether basing
testimony upon professional studies or personal experience,
employs in the courtroom the same level of intellectual rigor
that characterizes the practice of an expert in the relevant
field."  Kumho Tire, 526 U.S. at 152.

Here, Dodds based her opinion on 25 scholarly references
and her nearly 50 years of experience as a veterinarian in the
field of immunology.  The two studies that plaintiffs so
strongly criticize do not contradict Dodds's opinion.  These
studies, which plaintiffs attach as exhibits to their motion to
exclude, conclude that the risk of vaccine associated adverse
events in dogs and cats is increased by factors such as young
adult age, small size, neutering, and receipt of multiple
vaccinations per visit. (Doc. #207-3, p. 11, Dodds Letter.)  The
studies also conclude that "adverse [vaccine] reaction risk was
inversely related to dog and cat weight, meaning that the
smaller animals had more reactions." (Doc. #207-3, p. 12, Dodds
Letter.)

These findings support Dodds's ultimate conclusion that
defendant's practice of giving half-doses of vaccines to pets
weighing less than 50 pounds was reasonable because it
"decreased the adverse vaccine reactions."  (Doc. #207-3, p. 13,

Dodds Letter.)  Whether the substance of Dodds's opinion is correct is not for the court to decide.  Travelers Prop & Cas. Co., 150 F. Supp. 2d at 364.  The court has reviewed the record and literature provided by both parties and concludes that Dodds's opinion rests on a sufficiently reliable foundation of professional studies and personal experience.  Her opinion is "more than subjective belief or unsupported speculation." Daubert, 509 U.S. at 590.

        2. Application to the Facts of this Case

Having determined that Dodds's opinion is based on a reliable foundation, the court now considers whether it is relevant to the case at hand.

Plaintiffs submit that Dodds's opinion should be excluded because it does not "fit" the facts of this case.  In support of this argument, plaintiffs again point to Dodds's reliance on her unpublished 1970s study.  They argue that because that study involved only dogs weighing less than 12 pounds and did not test cats of any weight or the effects of half-doses of the rabies vaccine, it is not relevant to the facts here because defendant allegedly administered half-doses of all vaccines, including rabies, to both dogs and cats weighing less than 50 pounds.

"[T]he question of fit is whether the testimony can be applied to the facts at issue . . . .  [F]it is a question of the connection between the scientific research presented and the

particular disputed factual issues in the case." Pugliano v.
United States, 315 F. Supp. 2d 197, 202 (D. Conn. 2004).  The
element of fit "is essentially a requirement of relevance."
Amorgianos, 137 F. Supp. 2d at 163.  "In assessing relevance,
the judge looks to Rule 401, which deems evidence relevant if it
has any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or
less probable than it would be without the evidence." Adesina
v. Aladan Corp., 438 F. Supp. 2d 329, 342 (S.D.N.Y. 2006)
(internal quotation marks omitted).

     As stated above, Dodds's opinion is based on more than just
her 1970s study.  The other literature she cites, specifically
the two studies based on Banfield's own data, show a correlation
between pets' weight and the frequency of vaccine associated
adverse events.  Her opinion is relevant to the disputed fact of
whether defendant acted reasonably in giving half-doses of
vaccines to pets based on their weight in an effort to reduce
occurrences of vaccine associated adverse events.  There is not
"too great an analytical gap between the conclusions reached by
the authors of [Dodds's] cited articles and the conclusions that
she draws from their work." Amorgianos, 303 F.3d at 270.

     Plaintiffs also take aim at Dodds's opinion that it is
within the standard of care to store remaining half-doses of
vaccine for use in the vaccination of another pet within 10

minutes. (Doc. #207-3, p. 14, Dodds Letter.)  They argue that
this aspect of Dodds's opinion also does not fit the facts of
this case because defendant admitted storing leftover doses of
vaccines throughout the day--not just for 10 minutes.
Plaintiffs misapprehend defendant's admission.  Defendant
admitted only that he stored unused portions of vaccines in the
refrigerator throughout the day.  Contrary to plaintiffs'
assertion, he did not admit that he kept the *same* vaccine vial
in the refrigerator for the entire day. (Doc. #159, ¶ 41,
Amended Answer.)  Dodds's opinion will assist the jury in
determining whether defendant's vaccine storage practices were
reasonable and within the standard of care.  Whether the jury
finds that defendant stored each remaining half-dose throughout
the entire day or for some other amount of time, Dodds's opinion
will assist the jury in reaching a conclusion about the
reasonableness of defendant's actions.

All of plaintiffs' objections go to the weight of Dodds's
testimony, rather than to its admissibility.  See Adesina, 438
F. Supp. 2d at 343 (finding expert's testimony relevant where
plaintiff's objections to expert's testimony went only to
weight, not admissibility).  "Vigorous cross-examination,
presentation of contrary evidence, and careful instruction on
the burden of proof are the traditional and appropriate means of
attacking shaky but admissible evidence."  Daubert, 509 U.S. at

596.  The court concludes that Dodds's opinion is based on both reliable principles and methodologies and is relevant to assisting the jury in resolving disputed factual issues about defendant's vaccine practices.  For these reasons, plaintiffs' motion to exclude Dodds's testimony is DENIED.

     B. Patricia Jordan

Plaintiffs next argue that the court should preclude defendant's expert, Patricia Jordan, D.V.M. ("Jordan"), from testifying because her opinions are neither reliable nor relevant.  Jordan is a veterinarian with 25 years of experience.  It is her opinion that a veterinarian need not give any specific vaccine dosage to meet the standard of care in veterinarian medicine.  Defendant offers this testimony to show that that his practice of giving half-doses of vaccines to pets weighing less than 50 pounds was reasonable and within the standard of care.  Upon reading Jordan's report and considering the evidence presented, the court concludes that her testimony fails to meet the Daubert threshold.

Jordan's report is based upon her personal experience as a veterinarian as well as training and information she received from other veterinarians.  Although she identifies several veterinarians who promulgated studies and information upon which she bases her opinion, her overall report is largely anecdotal.  See, e.g., Koppell v. New York State Bd. of Elections, 97 F.

Supp. 2d 477, 481 (S.D.N.Y. 2000) (excluding testimony because expert's analysis was "largely anecdotal and does not rely upon any type of expertise that would assist the trier of fact in rendering the ultimate determination").  While defendant maintains that Jordan consulted a "great volume of sources . . . in addition to her significant clinical and academic experience," she does not cite, attach, or otherwise reference any published, tested, or peer-reviewed studies, literature, or articles that support her opinion.  Rather, her report is a compilation of her and others' general opinions about vaccinations.  See Koppell, 97 F. Supp. 2d at 481 ("To the extent that the report is merely relying on consensus or the opinions of others, [the witness] lacks any particular expertise."); see also Playtex Products, Inc. v. Procter & Gamble Co., No. 02 CIV. 8046 (WHP), 2003 WL 21242769, at *10 (S.D.N.Y. May 28, 2003) (excluding expert testimony where report was an unreliable "anecdotal compendium of opinions").

Despite Jordan's significant experience as a veterinarian, her report is not founded on expertise in the field of vaccinations or any other reliable methodology or principle and thus fails to meet the reliability requirements of Daubert.  See Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 354 (S.D.N.Y. 2005) ("An anecdotal account of one expert's experience, however extensive or impressive . . . does not by

12

itself equate to a methodology, let alone one generally accepted by the relevant professional community.  While the Daubert standard does not require that every detail of expert testimony be supported by academic literature, it does mandate that conclusions [be] supported by good grounds for each step in the analysis.") (internal quotation marks omitted).  Accordingly, because Jordan's analysis is largely anecdotal and does not rely upon any particular type of expertise, scientific methodology, or principles that would assist the jury in rendering its ultimate determination in this action, plaintiffs' motion to exclude her testimony is GRANTED.

    C. Gary M. Crakes

    Plaintiffs lastly argue that the court should preclude defendant's expert, economist Gary M. Crakes, Ph.D ("Crakes"), from testifying as to defendant's damages because he is not qualified to value lost business profits, nor is his opinion based on reliable methodologies.  Crakes has more than 33 years of experience as an economist and has consulted on approximately 3,000 cases.[6] (Doc. #212-4, p. 3, Crakes Dep.)  It is Crakes's opinion that defendant is entitled to damages for lost business

_____

    [6]Of those 3,000 cases, Crakes estimates that about five percent were employment cases.  He also has consulted in about 10 to 15 divorce cases.  The majority of his consulting has involved calculating lost future earnings or diminished earning capacity in personal injury and wrongful death cases. (Doc. #212-4, pp. 17-18, Crakes Dep.)

profits between $3.3 and $6.6 million, based on four different scenarios.[7] (Doc. #212-3, pp. 9-10, Crakes Report.)

### 1. Crakes's Qualification as an Expert

Plaintiffs do not contest Crakes's expertise in calculating diminished earning capacity and loss of future earnings in tort cases.  They argue, however, that Crakes "has no experience valuing businesses and performing lost-profits analyses."  (Doc. #221, p. 6, Pl. Memo. of Law.)  Plaintiffs argue that Crakes's opinion is tantamount to an opinion on defendant's diminished future earnings capacity.  That is not the issue in this case, they say.  According to plaintiffs, the only damages defendant may pursue in this case are lost business profits.

Courts in this district previously have found Crakes to be qualified to testify as an expert witness on the issue of economic loss.  See, e.g., Crockford v. Spencer, No. 3:10CV813 (HBF), 2012 WL 370187, at *3 (D. Conn. Feb. 3, 2012) (defendants did not take issue with Crakes's credentials, but court agreed Crakes is qualified to render expert opinion on plaintiff's economic loss following accident); Ferrarelli v. United States,

---

[7]Crakes based his economic loss calculations on four scenarios in which he assumed plaintiff had continued working at his former Banfield pet hospital: (1) if defendant had worked until age 70 and continued to earn his 2012 income; (2) if he had worked until age 65 and continued to earn his 2012 income; (3) if he had worked until age 70 and earned his average income from 2010 to 2012; and (4) if he had worked until age 65 and earned his average income from 2010 to 2012.

No. CV 90-4478 JMA, 1992 WL 893461, at *2 (E.D.N.Y. Sept. 24, 1992) ("Dr. Crakes' credentials and experience amply qualified him to testify as an expert on the issue of economic loss.")  In those cases, however, Crakes calculated the plaintiff's lifetime unimpaired earning capacity as a result of personal injury following an accident and the decedent's lost future earnings as a result of wrongful death, respectively.

Here, Crakes was tasked with calculating defendant's lost business profits as a result of plaintiffs' alleged breach of the parties' franchise agreement.  Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1185 (2d Cir. 1995) (citation omitted) ("In Connecticut, as elsewhere, the general rule of damages in a breach of contract case is an award designed to place the injured party in the same position that party would have occupied had the contract not been breached . . . .  The remedy is the profits lost as a result of the breach.").  Crakes admittedly never has consulted in a commercial dispute nor has he performed lost profit analyses of businesses other than in the partnership or sole proprietorship context. (Doc. #212-4, p. 12, Crakes Dep.)

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony . . . .  Lack of specific

15

experience in a particular area is not determinative; rather, to find an expert unqualified, the court must find the expert's general experience insufficient to qualify the expert to testify about the issue in the case at hand." Ryan v. Nat. Union Fire Ins. Co. of Pittsburgh, P.A., No. 3:03CV0644(CFD), 2010 WL 2232670, at *2 (D. Conn. June 2, 2010) (citation and internal quotation marks omitted).

Although Crakes lacks experience in the particular area of calculating lost business profits, a review of his report, curriculum vitae, and deposition testimony reveals that he has superior knowledge and experience as an economic consultant and is qualified to testify as to defendant's damages.

## 2. Reliability of Crakes's Opinion

Plaintiffs also argue that Crakes's opinion is not based on reliable principles or methodologies.  They submit that his calculations are speculative and cannot be proven with a reasonable degree of certainty.

Although absolute certainty is not required for damage calculations, "expert testimony should be excluded if it is speculative or conjectural . . . or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith . . . other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21

(2d Cir. 1996) (citations and internal quotation marks omitted).
The court "plays a gatekeeper role in its admission or exclusion
of expert testimony, but once admitted, any other questions
regarding an expert's opinion, testimony or qualifications go to
the weight and credibility of that expert—questions reserved for
the jury." Munn v. Hotchkiss Sch., 24 F. Supp. 3d 155, 171 (D.
Conn. June 5, 2014).

Plaintiffs argue that Crakes's opinion is unreliable
because (1) he provides a wide range of damages based on four
different calculations of defendant's lost income; (2) he fails
to discount his calculations to present value based on an
identified growth rate; and (3) his adjustment for "capital fund
for payout of interest," is not based on a peer-reviewed or
reliable methodology.

Crakes's use of four different scenarios (see note 7,
supra) to calculate defendant's damages is not speculative.
Rather, each represents a plausible situation that the jury
could find applicable.  When calculating each of these
scenarios, Crakes based his figures for defendant's past
earnings on his tax returns. (Doc. #212-4, p. 5, Crakes Dep.)
In making assumptions about defendant's work-life expectancy,
Crakes relied on data from a report published by the U.S.
Department of Health and Human Services entitled, "National
Vital Statistics Reports, 2008." See, e.g., Earl v. Bouchard

Transp. Co., 735 F.Supp. 1167, 1175 (E.D.N.Y.) ("Statistical charts, such as the mortality tables and the work-life expectancy tables prepared by the United States Department of Labor . . . are often deemed authoritative.").

When calculating defendant's damages in each of these four situations, Crakes also took into consideration defendant's mitigation of damages.  See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 110 (2d Cir. 2007) ("The non-breaching party is, of course, under a duty to mitigate damages to the extent practicable . . . and any proceeds generated from mitigation should be accounted for in the ultimate award of damages.") (citation omitted).  Crakes accounted for mitigation of damages by deducting the average Connecticut veterinarian's salary in 2013 from his calculation of defendant's projected annual earnings.  Crakes's opinion previously has been found to be admissible even though his calculation of economic loss did not at all address mitigation.  See Castelluccio v. Int'l Bus. Machines Corp., No. 3:09CV1145(DJS), 2012 WL 5408420, at *6 (D. Conn. Nov. 6, 2012).  Any issues plaintiffs may have with the figures Crakes used to reach this mitigation calculation go to the weight his testimony should be given, not its admissibility. See Adesina, 438 F. Supp. 2d at 343.

Contrary to plaintiffs' argument, Crakes reduced defendant's damages to "present value" by applying a discount

18

rate of "1% less than the growth rate." (Doc. #212-3, p. 6,
Crakes Report.)  Connecticut law recognizes that "[i]n economic
theory . . . the current market value of a company is the
discounted present value of the estimated flow of future
earnings."  Beverly Hills Concepts, Inc. v. Schatz & Schatz,
Ribicoff & Kotkin, 247 Conn. 48, 66, 717 A.2d 724, 734 (1998)
(internal quotation marks omitted).  Although Crakes did not
identify the growth rate he used in making this calculation,
this alone does not render his calculation of damages to present
value unreliable; plaintiffs are free to explore this issue on
cross-examination.

Plaintiffs also challenge Crakes's calculation of a
"capital fund adjustment"[8] to his present value calculation by
using his own computer software program.  Crakes explained that

---

[8]Crakes explained the capital fund adjustment as follows:

[T]he assumption that I made is that on average,
earnings growth rates will be one percent less than
the discount rate, but typically for most workers,
earnings increases occur perhaps once or twice per
year.  If interest compounds any more frequently than
that, interest on interest, there could be some
balance left at the end of the work life . . . .  If
we allow for a more frequent compounding of interest,
interest compounds more frequently than earnings
raises occur, then I make a deduction for that
purpose.  If they occur at the same frequency, there
is no need for the deduction.  I don't know of any
other economists that make this deduction.  It's
something that I do because I feel it's a reasonable
thing to do.

(Doc. #212-4, pp. 39-40, Crakes Dep.)

he has been making capital fund adjustments for the past 25 years using a proprietary computer software program.  (Doc. #212-4, pp. 41-42, Crakes Dep.)  Plaintiffs argue that this methodology is unreliable because it has not been peer-reviewed and because Crakes admittedly does not know of any other economist who makes this deduction. (Doc. #212-4, p. 43, Crakes Dep.)  Lack of peer review alone is not a fatal flaw to the reliability of an expert's opinion.  See Peerless Ins. Co., 2012 WL 1288196, at *2 ("Though the lack of peer review . . . may be explored on cross examination, the absence of peer review alone does not warrant excluding [an expert's] testimony.").

The overall bases for Crakes's calculations are well-supported.  Plaintiffs' arguments go to the weight the jury should place on Crakes's opinion, not its admissibility.  His opinion is relevant to assisting the jury in determining the amount of damages to which defendant may be entitled.  Any criticisms about Crakes's methodology can be explored by plaintiffs on cross-examination. See Daubert, 509 U.S. at 596. Plaintiffs' motion to exclude Crakes's opinion is therefore DENIED.

IV.  Conclusion

For the foregoing reasons, plaintiffs' motion to exclude Dodds's testimony (Doc. #206) is DENIED; their motion to exclude

Jordan's testimony (Doc. #208) is GRANTED; and their motion to exclude Crakes's testimony (Doc. #212) is DENIED.

SO ORDERED at Hartford, Connecticut this 31st day of March, 2015.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge