UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
CHARTER PRACTICES              :
INTERNATIONAL, LLC, ET AL.,    :
                               :
      Plaintiffs,              :
                               :
v.                             :     CASE NO. 3:12-cv-1768(RNC)
                               :
JOHN M. ROBB,                  :
                               :
      Defendant.               :
```

RECOMMENDED RULING ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Charter Practices International, LLC ("CPI") and Medical Management International, Inc. ("MMI") (collectively, "Banfield" or "the Banfield plaintiffs"), operate company-owned and franchised Banfield Pet Hospitals. Banfield brings this breach of contract action against its former franchisee, veterinarian John M. Robb ("Dr. Robb"). Dr. Robb asserts four counterclaims against Banfield. (Doc. #159.) Pending before the court is Banfield's reinstated motion for summary judgment.[1] (Doc. #268, 225.) For the following reasons, I recommend that the motion be DENIED.

I.    Background

A summary of the parties' allegations follows.

---

[1] In June 2014, Banfield filed a motion for summary judgment. (Doc. #225.) U.S. District Judge Robert N. Chatigny referred the motion to me. (Doc. #228.) I denied the motion without prejudice to reinstatement after the court's ruling on several pending discovery motions. (Doc. #255.) Thereafter, Banfield reinstated its motion for summary judgment. (Doc. #268.)

A. <u>Banfield's Allegations</u>

In 2008, Banfield and Dr. Robb entered into a franchise agreement called the "Charter Practice Agreement" ("CPA") under which Dr. Robb operated a Banfield Pet Hospital inside a PetSmart store in Stamford, Connecticut.  About four years later, in December 2012, Banfield became concerned about how vaccines were being administered at Dr. Robb's hospital. Banfield sent Dr. Robb a "Notice of Termination" dated December 7, 2012, advising him that the CPA would terminate effective February 5, 2013.  The notice also said that Banfield was invoking the "step in" provision of the CPA, allowing it to operate the hospital until Dr. Robb's termination became effective.  Ten days after Banfield issued the notice of termination, it commenced this breach of contract action. Banfield alleges that Dr. Robb disrupted operations and interfered with its contractual right to step in and operate the hospital pending termination of the CPA.

B. <u>Dr. Robb's Counterclaims</u>

Dr. Robb counterclaimed.  He alleges: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a <u>et seq.</u> ("CUTPA"); and (4) negligent infliction of emotional distress. (Doc. #159.)

Dr. Robb alleges that he made an investment of more than $400,000 when he began his franchise in May 2008. Shortly after he became a franchisee, Mars, Inc. purchased the vast majority of Banfield's stock. Dr. Robb alleges that Mars "embarked on an unlawful plan to de-franchise the BANFIELD® pet hospital network and make most of the BANFIELD® pet hospitals company-owned." (Id. ¶¶ 11, 12.) He believes that the goal of this plan was to remove all veterinarian franchisees and replace them with salaried employees. In just a few years, Banfield reduced the number of veterinarian-owned franchises from several hundred to fewer than one hundred.

Dr. Robb alleges that as part of this plan, Banfield made below-market offers to repurchase veterinarian-owned franchises. These offers "were accompanied by threats to put the veterinarian out-of-business through a scorched-earth litigation plan, which the veterinarian could not afford to litigate." (Id. ¶ 13.) Dr. Robb received such an offer and rejected it. According to Dr. Robb, if and when the below-market offer was rejected, Banfield proceeded to the "second phase of the plan," wherein it "would abuse in an unreasonable and unjustified manner," its "'business judgment' under the CPA" by categorizing alleged problems with the franchisee as severe enough to allow immediate termination of the franchise and exercise of step-in rights to run the hospital, "resulting in immediate displacement

of the veterinarian without any meaningful notice or opportunity to cure, as mandated by the CPA." (Id. ¶ 14.)

On December 6, 2012, Dr. Robb participated in a videoconference with Banfield's executive committee to discuss his practice of administering reduced-volume vaccines.  Dr. Robb offered to perform "titer tests" to reveal the level of immunity in the vaccinated pets' systems, thereby demonstrating that his professional judgment was sound.  The executive committee refused.  The next day, Banfield sent Dr. Robb a letter stating that his actions constituted a breach of the CPA.  Banfield terminated his franchise and immediately exercised its step-in rights to run the franchise.  Dr. Robb denies that he breached the CPA and maintains that there was no justification for terminating his franchise.  He submits that his medical and ethical judgment concerning half-dose vaccines, which he concedes "may not be in conformance with the manufacturers' labels, [nonetheless] does not violate the standard of care required by the profession of veterinary medicine, nor the laws of the State of Connecticut." (Id. ¶ 22.)

As a result of Banfield's termination of his franchise and exercise of its step-in rights, Dr. Robb asserts that he was due a profit of $57,000 for the month of November 2012.  He alleges that when he spoke with a Banfield employee about his hospital's finances and the profits due him, the employee was surprised

that a check had not been sent.  He later spoke with an attorney for Banfield who told him that "he would never get the money and that Banfield would bankrupt him." (Id. ¶ 26.)  Dr. Robb submits that Banfield's improper exercise of the step-in rights and refusal to pay the $57,000 was "an effort to financially squeeze [him] and bend him to [Banfield's] will . . . exactly according to the unlawful pre-meditated plan."  (Id. ¶ 26.)

Dr. Robb also alleges that one day in December 2012, after Banfield had stepped in to operate the hospital, he was protesting peacefully and distributing literature near the hospital when a Banfield agent lied to the police, leading them to take Dr. Robb to a nearby hospital for psychological evaluation.  This caused him severe emotional distress.

## II.  Undisputed Facts

The following facts, drawn from the parties' Local Rule 56(a)1 and 56(a)2 statements, are undisputed.

### A. MMI, CPI, and the Banfield Trademarks

MMI is an Oregon-based company that created a business method (the "system") for developing, organizing, and operating veterinary hospitals that offer full-service veterinary care and related services. (Parties' Local Rule 56(a)1 & 56(a)2 Stmts., Doc. #225-2, 282-2, ¶ 1.)  CPI is an affiliate of MMI and also is located in Oregon. (Id. ¶ 5.)  MMI's system includes a hospital management system, medical protocols, quality assurance

programs, inventory control guidelines, specifications and procedures of business operations, accounting procedures, and other management systems. (Id. ¶ 3.)  MMI has a contractual relationship with PetSmart to place hospitals, either company-owned or franchised, in PetSmart stores throughout the United States. (Id. ¶ 2.)  The hospitals use MMI's system. (Id.) Veterinarian franchisees use a computerized medical records system called "PetWare®," which offers a centralized medical records system. (Id. ¶ 69.)  Using PetWare, veterinarians record information such as diagnoses, lab results, and medical histories. (Id. ¶ 70.)  One of PetWare's screens, entitled "Medical Notes," permits a veterinarian to add notes of any kind to a pet's record. (Id. ¶ 71.)

MMI owns certain federally registered trademarks, including BANFIELD® and BANFIELD, THE PET HOSPITAL® ("the marks"). (Id. ¶ 4.)  MMI, CPI, and their franchisees and licensees have expended millions of dollars in advertising and promoting the marks. (Id. ¶ 9.)  The public has come to know and identify the marks, including the BANFIELD® mark, as representing the source and sponsorship of services provided by MMI, CPI, and their franchisees and licensees. (Id. ¶ 10.)  Since 1993, MMI, CPI, and their franchisees and licensees continuously have engaged in the business of providing full service veterinary care and

related services using the marks. (Id. ¶ 6.)  Under the CPA,

franchisees license the right to use the marks. (Id. ¶ 8.)

On May 27, 2008, Dr. Robb executed a CPA that permitted him

to operate as a franchisee Banfield Pet Hospital #1867, located

inside a PetSmart store at 288 West Avenue in Stamford,

Connecticut. (Id. ¶¶ 11, 12.)

B. CPA Provisions

The parties agree that the CPA contains the following

relevant provisions.

Section 7.1:

> You must operate the Hospital in accordance with the
> System, except that, You may deviate from the System
> in the specific instances (if any) in which You, or
> the licensed veterinarians operating the Hospital,
> reasonably determine, in Your or their professional
> judgment, that the System would not satisfy statutory,
> regulatory, or professional ethical obligations.  In
> such instances, You or they may deviate from the
> System only to the extent You or they reasonably deem
> necessary to satisfy the applicable statutory,
> regulatory, or professional ethical obligations.
> Otherwise, You must comply with the System as
> expressed in PetWare®, the Operating Manual, and
> otherwise in writing by CPI, and You must meet or
> exceed CPI's minimum quality standards . . . [which]
> may be higher than the standards of veterinary
> practices generally prevailing in the community in
> which the Hospital is located.

(Id. ¶¶ 15, 19.)

Section 7.16:

> You must conduct Your business following the highest
> standards of honesty, integrity, fair dealing, and
> ethics.  You must do nothing that would tend to
> discredit, dishonor, reflect adversely upon, or in any

7

manner injure the reputation of MMI, CPI, their
affiliates, or the [network of veterinary hospitals
operating under the System].

(Id. ¶ 14.)

Section 9.3.1:

CPI may terminate this Agreement and any other
agreements with You by written notice, effective
immediately, without giving You an opportunity to
cure, if You . . . (h) Make or have made any
misrepresentation or misstatement to CPA, or if You
maintain false books or records or submit any false
report to CPI . . . (k) Or any owner, manager or
principal officer commits any crime, offense or any
other violation of law, or engages in any other
conduct that CPI believes is reasonably likely to have
an adverse effect on the Network [defined as the
veterinary hospitals operating under the System, MMI's
distinctive business method], the Marks, the goodwill
associated therewith, or CPI's interest therein . . .
(n) Or any owner, manager or principal officer
operates the Hospital in a manner that creates a
danger to Pets, clients or public health or safety . .
. (q) Falsify medical records.

(Id. ¶ 86.)

Section 9.10.1:

In order to prevent any interruption of the operation
of the Hospital that would cause harm to the Hospital
or to the reputation of the Network, You authorize CPI
or its designee to step in to operate the Hospital if,
in CPI's reasonable judgment . . .  CPI decides that
significant operational problems exist which require
CPI to operate the Hospital for a time.

(Id. ¶ 94.)

Section 9.10.2:

All revenue derived during CPI's operation of the
Hospital will be for Your exclusive account.  CPI may
pay from that revenue all expenses, debts, and
liabilities incurred during CPI's operation of the

> Hospital, including the Royalty and Service Fee and
> any other amounts due under this Agreement. This will
> include CPI's personnel and administrative costs, plus
> 25 percent of such personnel and administrative costs
> to cover CPI's overhead expenses.

(Id. ¶ 159, 160.)

Section 9.10.5:

> You must pay the reasonable legal and accounting fees
> and costs incurred by CPI in exercising its rights
> under this Section.

(Id. ¶ 172.)

Section 12.14:

> The prevailing party in any arbitration, insolvency
> proceeding, bankruptcy proceeding, suit or other legal
> action . . . between You and CPI or its affiliates . .
> . is entitled to recover its arbitration costs, court
> costs and reasonable attorney fees . . . .

(Id. ¶ 173.)

### C. Termination of the CPA

On December 6, 2012, Dr. Robb participated in a

videoconference with Banfield's executive committee about his

vaccine practice. (Id. ¶ 24.)  The following day, Banfield sent

Dr. Robb a notice of termination. (Id. ¶ 103.)  The notice

stated that Banfield was terminating the CPA on February 5,

2013, without an opportunity to cure, pursuant to §§ 9.3.1 (h),

(k), (n), and (q).  Effective immediately, CPI's affiliate, A

Caring Doctor (Minnesota), P.A., stepped in to operate the

hospital. (Id. ¶¶ 104-06.)  CPI's affiliate operated the

hospital from December 7, 2012 until Dr. Robb's franchise terminated on February 5, 2013. (Id. ¶ 107.)

During the step-in period, Banfield sent letters to all of Dr. Robb's former clients offering to re-vaccinate, at no cost, all of the pets that had been given half doses. (Id. ¶ 112.) CPI notified the Connecticut State Veterinary Board about Dr. Robb's vaccine practice. (Id. ¶ 109.)  Also during the step-in period, on December 20, 2012, Dr. Robb distributed literature outside his former hospital accusing Banfield of over-vaccinating and harming pets. (Id. ¶ 141.)  He was arrested for trespass. (Id. ¶ 142.)

D. Dr. Robb's Vaccine Practice

In December 2012, it was Dr. Robb's practice to administer half doses (0.5mL)[2] of vaccines to dogs weighing less than 50 pounds.  This practice had evolved over time. (Banfield's 56(a)1 Stmt., Doc. #225-2, ¶¶ 20, 32; Dr. Robb's 56(a)2 Stmt., Doc. #282-2, ¶¶ 20, 34.)  In exceptional circumstances, such as when treating a one-pound dog, Dr. Robb would administer less than half a dose.  (Banfield's 56(a)1 Stmt., ¶ 36; Dr. Robb's 56(a)2 Stmt., ¶ 38.)

Dr. Robb began administering half doses in an attempt to reduce the rate of pets' adverse reactions to vaccines.

_____

[2]A 0.5mL dosage is less than the manufacturers' recommendation of 1mL. (Dr. Robb's 56(a)2 Stmt., ¶ 20.)

(Parties' 56(a) Stmts., ¶ 54.)  At no time did Dr. Robb inform the state of Connecticut that he was giving half doses of the rabies vaccine. (Parties' 56(a) Stmts., ¶ 53.)  When he administered less than a full dose of vaccine, Dr. Robb neither recorded the exact dosage nor entered a note in PetWare indicating he had done so. (Id. ¶ 68.)

The cost of vaccines is included in Banfield's animal healthcare plan, the "Optimum Wellness Plan," in which the majority of its customers participate. (Id. ¶ 77, 78.) Regardless of participation in the wellness plan, Dr. Robb did not adjust client invoices when he administered only a half dose of vaccine. (Id. ¶¶ 76, 80.)

III. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is a fact that influences the case's outcome under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  A "genuine" dispute is one that a reasonable jury could resolve in favor of the non-movant.  Id.

The moving party bears the initial burden of establishing that there are no genuine disputes as to any material fact. Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

11

Once such a showing is made, the non-movant must show that there is a genuine issue for trial. Id. The parties may support their assertions by either

> (A) citing particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The court may rely on admissible evidence only, Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010), and must view the evidence in the record in the light most favorable to the non-movant, drawing all reasonable inferences in that party's favor. Weinstock, 224 F.3d at 41.

IV. Banfield's Motion for Summary Judgment

Banfield seeks summary judgment on each of Dr. Robb's counterclaims: (A) breach of contract; (B) breach of the implied covenant of good faith and fair dealing; (C) violation of CUTPA; and (D) negligent infliction of emotional distress. Banfield also requests summary judgment on its affirmative claims of breach of contract and violation of CUTPA. I consider each claim in turn.

A. Breach of Contract

The parties make opposing breach of contract claims.  Under Connecticut law,[3] "[t]he elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages."  United Rentals, Inc. v. Price, 473 F. Supp. 2d 342, 346 (D. Conn. 2007) (internal quotation marks omitted).  Banfield moves for summary judgment on its breach of contract claim as well as Dr. Robb's counterclaim.  Banfield argues that it had good cause to terminate Dr. Robb's franchise under §§ 9.3.1 (h), (k), (n), and (q) of the CPA because Dr. Robb breached various CPA provisions[4]

_____

[3]Banfield argues that the CPA is governed by Oregon law. Dr. Robb disagrees, noting that the CPA specifically states that Oregon law does not apply if the franchise laws of another state require the application of its laws.  Because Dr. Robb's counterclaims are based on Banfield's purported violation of the Connecticut Franchise Act and CUTPA, he argues Connecticut law applies.  He also asserts that a franchisee's rights under the Connecticut Franchise Act cannot be contracted away.  Conn. Gen. Stat. § 42-133f(f).  The parties' disagreement about which state's law applies need not be resolved now.  The elements of breach of contract are the same under both states' laws.

[4]Specifically, Banfield argues that Dr. Robb's conduct violated the CPA's requirements: (1) to "meet or exceed CPI's minimum quality standards," which "may be higher than the standards of veterinary practices generally prevailing in the community in which the hospital is located"; (2) to operate the hospital in accordance with the Banfield system and medical standards, to follow the "highest standards of honesty, integrity, fair dealing, and ethics," and not to do anything "that would tend to discredit, dishonor, reflect adversely upon, or in any manner injure [Banfield's] reputation"; and (3) to comply with "all applicable laws, ordinances and regulations . . . includ[ing] laws relating to the practice of veterinary medicine." (CPA §§ 7.1, 7.16, 7.17, Doc. #225-4, pp. 41, 47.)

by (1) administering half doses and improperly storing vaccines; and (2) falsifying medical records and invoices.

Dr. Robb denies that he breached the CPA.  He alleges in his counterclaim that because he did not breach the CPA, Banfield did not have good cause to terminate the CPA and therefore it is liable for breach of contract.  Dr. Robb also alleges that Banfield did not give him 60 days of notice prior to terminating his franchise, as required by the Connecticut Franchise Act, nor did it pay him the profits earned during the step-in period.

### 1.    Dr. Robb's Vaccine Practice

In order for Banfield to succeed on summary judgment on both its affirmative claim and Dr. Robb's counterclaim for breach of contract, the undisputed facts must demonstrate that Dr. Robb breached the CPA, thereby giving Banfield good cause to terminate his franchise.

The only undisputed facts about Dr. Robb's vaccine practice are that he administered less than the manufacturers' recommended dose of the rabies vaccine (depending on a pet's weight) and stored the remaining dose for another pet.  The parties vigorously contest the details of when and how Dr. Robb began this practice, the exact dosage given to pets depending on their weight, and the duration and manner in which remaining doses were stored and reconstituted.  Because nearly every

14

material fact concerning Dr. Robb's vaccine practice remains in dispute, the court cannot determine at this stage whether Banfield properly terminated his franchise.

2.    Dr. Robb's Record Keeping and Invoicing

Unlike Dr. Robb's vaccine practice, the material facts concerning his record keeping and invoicing are undisputed.  The parties agree that Dr. Robb did not keep records in PetWare of administering less than a full dose. (Parties' Local Rule 56(a)1 & 56(a)2 Stmts., Doc. #225-2, 282-2, ¶ 68.)  Nor did he adjust invoices for reduced-volume vaccines, regardless of whether the client participated in Banfield's wellness plan.[5] (Id. ¶¶ 76, 80.)

Dr. Robb contends that these facts, standing alone, are insufficient to show that his conduct breached the CPA.  He argues that there remain genuine disputes of material fact concerning Banfield's protocols.  More particularly, he maintains that Banfield did not require that he record the exact dosage given, nor was there a place in PetWare to do so.  Although PetWare allows space for a veterinarian to enter

---

[5]The parties disagree about the exact percentage of clients at Dr. Robb's former hospital who participated in the wellness plan in 2012.  Banfield estimates that 63.1% purchased wellness plans, whereas Dr. Robb estimates that the figure is closer to 95%. (Parties' 56(a) Stmts., ¶ 78.)  Although this fact is disputed, it is not material to the determination of whether Dr. Robb's failure to adjust the price of vaccines for customers whose pets received less than a full dose of vaccine constituted falsification of invoices in violation of the CPA.

diagnoses, lab results, medical histories, and "Medical Notes" (Id. ¶¶ 70, 71), Dr. Robb contends that the system includes only a checkbox to indicate whether a vaccine was administered, but no field in which to specify the dosage.  Nor was it Banfield's protocol to require such a notation.  (Dr. Robb's 56(a)2 Stmt., Ex. B, Dr. Robb's Decl., ¶36; Ex. I, Gibson Depo., p. 27.)

Banfield maintains that its protocols require veterinarian franchisees to record all medical notes of a visit, including vaccine dosage.  Vincent Bradley, Senior Vice President of Operations for MMI and Vice President of CPI stated that "Banfield medical protocols require Banfield veterinarians to state in the medical records all material information about the pet's treatment.  Such material information includes the dose of medications administered."  (Banfield's 56(a)1 Stmt., Ex. A, Bradley Decl., ¶ 39.)  He posited that Dr. Robb "could have entered the dose of vaccine he administered into the PetWare Medical Notes." (Id. ¶ 40.)  By contrast, Sandra Dudzic, another Banfield employee, testified that Banfield does *not* have a protocol requiring veterinarians to record the amount of vaccine administered to pets.  (Doc. #73, Tr. 1/22/13, pp. 90-92.)  Rather, she stated that Banfield's protocol is "just to put it in the medical record that the vaccine was given, but not if it was 1 cc or half cc."  Id.  (Dr. Robb's 56(a)2 Stmt., Ex. H, Nieves Depo., p. 36; Ex. I, Gibson Depo., p. 28.)  Whether it

was Banfield's protocol to note the dosage and whether Dr. Robb should have noted it in PetWare are genuine disputes of material fact.

The same is true for invoices.  Dr. Robb argues that Banfield did not have a protocol requiring veterinarians to adjust invoices for reduced-volume vaccines, nor was it possible to do so because the majority of customers participated in the Optimum Wellness healthcare plan, which included the cost of vaccines.  Banfield points to no CPA provision or other protocol requiring its veterinarians to adjust client invoices depending on the vaccine dosage.  A genuine dispute of material fact exists as to whether Dr. Robb's failure to do so constitutes a breach of the CPA.

Considering the evidence in the light most favorable to the non-moving party, the jury reasonably could find that Banfield did not have a protocol requiring veterinarians to record exact vaccine dosages or to adjust client invoices for reduced-volume vaccines.  It follows that the jury reasonably could conclude that Dr. Robb's conduct did not breach the CPA.

The court therefore recommends that Banfield's motion for summary judgment as to its affirmative breach of contract claim be DENIED.  Because Dr. Robb's counterclaim is premised on the same disputed facts, and because a jury reasonably could resolve these disputes in Dr. Robb's favor, the court recommends that

17

Banfield's motion for summary judgment as to Dr. Robb's counterclaim be DENIED.

    B. Breach of the Covenant of Good Faith and Fair Dealing

    Banfield next moves for summary judgment on Dr. Robb's counterclaim for breach of the implied covenant of good faith and fair dealing.

    "It is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship . . . [E]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Andersen v. Governor & Co. of the Bank of Ireland, No. 3:11-CV-355 (VLB), 2011 WL 6001621, at *6 (D. Conn. Nov. 30, 2011) (internal quotation marks omitted). The covenant of good faith and fair dealing requires that "neither party to a contract do anything that will injure the right of the other to receive the benefits of the agreement." Clouston v. On Target Locating Servs., No. 3:01 CV 2404 (DJS), 2005 WL 2338883, at *6 (D. Conn. Aug. 19, 2005). To recover on a claim of breach of the implied covenant of good faith and fair dealing,

> a plaintiff must show that: (1) plaintiff and defendant were "parties to a contract under which the plaintiff reasonably expected to receive certain benefits;" (2) defendant "engaged in conduct that injured the plaintiff's right to receive some or all of those benefits;" and (3) defendant acted in bad faith in committing the acts that injured the plaintiff's right to receive the benefits it expected from the contract.

18

<u>Id.</u>[6]

Banfield acknowledges that Dr. Robb's counterclaim is based on the same underlying allegations as his breach of contract claim. (Banfield's Memo. of Law, Doc. #225-1, p. 17.)  Banfield argues, for the same reasons, that it is entitled to summary judgment because it properly terminated the CPA and exercised its step-in rights.  In light of the disputed facts discussed above, a reasonable jury could conclude that Banfield exercised its business judgment in an unreasonable manner and in bad faith by terminating the CPA without good cause.  Thus, Banfield's motion for summary judgment as to Dr. Robb's counterclaim for breach of the implied covenant of good faith and fair dealing should be DENIED.

C. <u>CUTPA</u>

Each party accuses the other of violating CUTPA.  Banfield moves for summary judgment on its affirmative claim as well as Dr. Robb's counterclaim.

A claimant "may establish a CUTPA violation by showing either a deceptive or unfair practice or a practice amounting to a violation of public policy . . . .  A practice is unfair (1) if it offends public policy as it has been established by statutes, the common law or otherwise, (2) if it is immoral,

---

[6]Both Connecticut and Oregon law impose the implied covenant of good faith and fair dealing in every contract.  The elements to establish a breach thereof are the same in both states.

unethical, oppressive or unscrupulous, or (3) if it causes substantial injury to consumers."  Walsh v. Seaboard Sur. Co., 94 F. Supp. 2d 205, 212-13 (D. Conn. 2000) (citation omitted).

Banfield makes three arguments in support of summary judgment on Dr. Robb's counterclaim.  First, it argues that to the extent his claim is based solely on the same allegations as his breach of contract claim, it fails as a matter of law.  Dr. Robb's CUTPA claim clearly consists of more than a mere recitation of his breach of contract claim.[7]

Next, Banfield contends that there is no evidence that it engaged in any offensive, immoral, or unethical conduct, or that it caused substantial injury to consumers.  There are genuine disputes of material fact concerning Banfield's termination of Dr. Robb's franchise and whether that decision was part of a

---

[7]Specifically, Dr. Robb alleges that Banfield "embark[ed] on an unlawful plan to de-franchise the BANFIELD® pet hospital network and make most of the BANFIELD® pet hospitals company-owned." (Doc. #159, ¶ 12.)  As part of this unlawful scheme, Dr. Robb alleges that Banfield made below-market offers to repurchase franchises from veterinarians. (Id. ¶ 13.)  These offers "were accompanied by threats to put the veterinarian out-of-business through a scorched-earth litigation plan, which the veterinarian could not afford to litigate." (Id.)  Dr. Robb received such an offer and rejected it. (Id.)  If and when the below-market offer was rejected, Dr. Robb alleges Banfield would proceed to the "second phase of the plan," wherein it "would abuse in an unreasonable and unjustified manner," its "'business judgment' under the CPA" by categorizing alleged problems with the franchisee as severe enough to allow the immediate termination of the franchise and exercise of step-in rights to run the hospital, "resulting in immediate displacement of the veterinarian without any meaningful notice or opportunity to cure, as mandated by the CPA." (Id. ¶ 14.)

broader scheme to de-franchise veterinarian-owned pet hospitals. Dr. Robb points to evidence showing that Banfield reduced the number of franchises during the relevant time period,[8] offered to repurchase Dr. Robb's franchise,[9] threatened him with this litigation if he rejected the offer,[10] and terminated his franchise without good cause.[11]  Considering the evidence in the light most favorable to the nonmoving party, a reasonable jury could find that Banfield's conduct violated CUTPA.

Lastly, Banfield argues, for the same reasons in its motion to dismiss, that Dr. Robb's CUTPA counterclaim is barred by the economic loss rule because he seeks to recover the same purely economic losses as in his breach of contract claim.  As explained in the court's recommended ruling on the motion to dismiss, the economic loss rule does not apply to Dr. Robb's CUTPA counterclaim.  See Doc. #50, p. 17.

Finding none of Banfield's arguments persuasive, the court recommends that its motion for summary judgment as to Dr. Robb's CUTPA counterclaim be DENIED.

---

[8]Banfield's corporate counsel testified that at its highest, there were over 200 franchised hospitals and now there are 119. (Dr. Robb's Memo. of Law, Ex. P, Eudy Depo., p. 7.)  Banfield asserts that its "growth strategy" was not to eliminate franchises but rather, not to expand the franchise program. (Dr. Robb's Memo. of Law, Ex. J, Bradley Depo., pp. 11-13, 17.)
[9]See Dr. Robb's Memo. of Law, Ex. J, Bradley Depo., p. 8.
[10]See Dr. Robb's Memo. of Law, Ex. B, Dr. Robb Aff., ¶ 7.
[11]See Sections IV.A. and IV.B., supra.

In its affirmative claim, Banfield argues that Dr. Robb's vaccine practice, record keeping, and interference with its operation of the pet hospital during the step-in period violated CUTPA.  Because there exist genuine disputes of material fact concerning Dr. Robb's vaccine practice and his conduct during the step-in period, summary judgment on Banfield's CUTPA claim should be DENIED.

D. <u>Negligent Infliction of Emotional Distress</u>

Banfield lastly moves for summary judgment on Dr. Robb's counterclaim for negligent infliction of emotional distress. Perhaps the most highly disputed facts concern the circumstances giving rise to this counterclaim.

"To prove a claim of negligent infliction of emotional distress, the plaintiff must establish that the defendant knew or should have known that its conduct involved an unreasonable risk of causing emotional distress, and that the distress, if it were caused, might result in illness or bodily harm."  <u>Buckman v. People Express, Inc.</u>, 205 Conn. 166, 173, 530 A.2d 596 (1987) (internal quotation marks omitted).

Dr. Robb alleges the following.  On December 13, 2012, Banfield's agent, Laurie Morris, lied to police and falsely claimed that Dr. Robb was "out of control."  (Dr. Robb's 56(a)2 Stmt., Ex. B, Doc. #282-4, Dr. Robb Aff. ¶ 52.)  As a result, the police hand-cuffed Dr. Robb and took him to a nearby

hospital for psychological evaluation. (Id.)  Banfield's
corporate counsel called Dr. Robb's wife and falsely stated that
he had been hospitalized for psychological issues. (Id. ¶ 53.)
Banfield agent Greg Trimarchi called the New Fairfield police
and stated that Dr. Robb was a danger to the community because
of his psychological issues. (Id.)  The next day, Dr. Robb was
protesting peacefully in front of a Starbucks near his former
pet hospital. (Id. ¶ 54.)  Banfield security guard Wayne
Hamilton falsely claimed that Dr. Robb made threatening
statements implicating the recent mass shooting in Newtown.
(Id.)  As a result, Banfield closed Dr. Robb's former pet
hospital for a week. (Id.)  On December 20, 2012, outside the
same Starbucks, Dr. Robb again distributed literature describing
Banfield's purported corporate takeover of veterinary medicine.
(Id. ¶ 55.)  At the request of the police, Dr. Robb relocated
his efforts to a nearby diner. (Id.)  He went to the PetSmart
store later that afternoon, where a cashier waved and greeted
him. (Id.)  The store security guard did not let him inside.
(Id.)  Dr. Robb was arrested. (Id.) He suffered severe emotional
distress as a result of these events.

Banfield casts a different version of these events.  It
alleges that on December 13, 2012, Dr. Robb entered the Stamford
PetSmart store quoting bible verses and stating that he had been
wrongfully terminated.  (Banfield's 56(a)1 Stmt., Ex. K, Morris

Decl., Doc. #225-15, ¶ 7.)  When Dr. Robb refused to leave, Ms. Morris called the police. (Id.)  Dr. Robb refused the police officer's request that he leave. (Id.)  He began praying out loud, and, while looking at Ms. Morris, stated, "Please, God, remove Satan from before me." (Id.)  The police summoned an ambulance and, together with ambulance staff, they restrained Dr. Robb and took him to a hospital for psychological evaluation. (Id.)  The next day, Dr. Robb spoke with Banfield's security guard and referred to the Newtown shooting. (Id. ¶ 10.) Banfield closed the pet hospital for the next two days. (Id. ¶ 11.)  Thereafter, on December 20, 2012, a veterinarian told Ms. Morris that Dr. Robb called and said he would be at the nearby Starbucks that morning. (Id. ¶ 12.)  Ms. Morris called the police. (Id.)  When Dr. Robb arrived, the police asked him to leave. (Id. ¶ 13.)  Dr. Robb refused and was removed from the premises. (Id.)  Later that day, Dr. Robb entered the PetSmart store, but was escorted out by the store security guard. (Id. ¶ 14.)  Ms. Morris again called the police. (Id. ¶ 15.)  Until the police arrived, Dr. Robb distributed material accusing Banfield of over-vaccinating and harming pets. (Id.)  Dr. Robb was arrested for trespass. (Id.)

Viewing the evidence in the light most favorable to the non-moving party, it is readily obvious that there are genuine disputes of material fact concerning the actions that gave rise

to Dr. Robb's alleged emotional distress.  The court therefore recommends that Banfield's motion for summary judgment as to Dr. Robb's counterclaim of negligent infliction of emotional distress be DENIED.

V.    Conclusion

For the foregoing reasons, Banfield's motion for summary judgment (doc. #268) should be DENIED in its entirety.

Any party may seek the district court's review of this recommendation.  See 28 U.S.C. § 636(b) (written objections to proposed findings and recommendations must be filed within fourteen days after service of same); Fed. R. Civ. P. 6(a), 6(d) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Thomas v. Arn, 474 U.S. 140, 155 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).  Failure to timely object to a magistrate judge's report will preclude appellate review.  Small v. Sec'y of Health and Human Serv., 892 F.2d 15, 16 (2d Cir. 1989).

SO ORDERED at Hartford, Connecticut this 10th day of March, 2016.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge